UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| KATHY M. PHILLIPS, | 3:16-CV-04151-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER AFFIRMING THE DECISION OF COMMISSIONER |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Kathy M. Phillips (Phillips) seeks reversal of the decision of the Acting Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits and supplemental security income (collectively "social security benefits"). Doc. 17. The Commissioner argues for affirming denial of benefits. Doc. 19. For the reasons explained below, this Court affirms the Commissioner's decision.

I.    **Procedural History**

Phillips protectively filed an application for supplemental security benefits and an application for disability insurance benefits on August 23, 2013, alleging disability due to depression, anxiety, lower back pain, and colitis, which she alleged began on August 1, 2012. AR[1] 240, 245, 287. The Commissioner denied Phillips's claims initially on January 3, 2014. AR 168–170. Phillips requested reconsideration of her claims, AR 173–74, and they were

---

[1] This Opinion and Order uses "AR" to refer to the Administrative Record, followed by the relevant page numbers therein.

denied upon reconsideration on April 18, 2014. AR 175–78. Phillips then sought a hearing before an Administrative Law Judge (ALJ), which was conducted on May 12, 2015.[2] AR 189–90, 77–115. On June 18, 2015, the ALJ issued his opinion denying Phillips's claims for social security benefits. AR 42–61.

Phillips then hired a new attorney, AR 38, who appealed to the Appeals Council and submitted new material. AR 9–10, 37. The new material included employment records, additional medical records from Phillips's treatment providers, records from Community Counseling Services, and an additional medical source statement from a treatment provider. AR 6–7. The Appeals Council purportedly considered this new information in stating: "[i]n looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." AR 2. The Order of the Appeals Council listed as exhibits the new material submitted by Phillips. AR 6–7. The Appeals Council denied Phillips's request for review of the ALJ's decision on September 13, 2016, stating in regard to the new material that "[w]e found that this information does not provide a basis for changing the Administrative Law Judge's decision." AR 1–2. Additionally, the Appeals Council noted that records from Horizon Healthcare dated July 10 to July 13, 2015, did not impact the ALJ's decision on disability, which was evaluated up to June 18, 2015, and advised Phillips that if she wished for the Appeals Council to consider whether she was disabled after June 18, 2015, she would need to apply again.[3] AR 2. By denying Phillips's request for review,

---

[2] The ALJ in Phillips's case was Denzel R. Busick and the hearing was held in Sioux Falls, South Dakota. AR 77.

[3] The Appeals Council listed additional records from Horizon Healthcare dated April 2, 2015 to July 1, 2015, as Exhibit 21F. AR 6. The records referenced in the letter as not having been considered actually span from July 10, 2015, to July 13, 2016, and are included in the Administrative Record. AR 11–21. This Court, therefore, assumes the Appeals Council merely typed the wrong date in the letter.

the decision of the ALJ became the final decision of the Commissioner, which Phillips now appeals to this Court.

## II.     Factual Background

### A. Phillips's Relevant Personal History

Phillips was born in January of 1963 in Huron, South Dakota, and currently resides there. AR 79, 240, 245. She was married for three years during her thirties, but her former spouse was an alcoholic and both verbally and physically abusive. AR 655. Phillips has one adult son from a different relationship who currently resides in Rapid City. AR 655. Phillips graduated from high school in 1981 and completed a program at Black Hills Beauty College in 1983 and 1984, though she no longer has her cosmetology license. AR 79–80. Phillips spent two years at the University of South Dakota, majoring in social work with a minor in drug and alcohol abuse. AR 79. When she was 31 and attending school at the University of South Dakota, her father visited her, suffered a major heart attack, and passed away in her apartment. AR 655. Phillips has one sister who is two years older and resides in Tombolt, Texas; Phillips and her sister are close and stay in touch regularly via telephone. AR 655. Phillips's mother resides in Huron and Phillips reports the two of them are very close. AR 655.

From 1997 to 2000, Phillips was an instructor at a center for persons with disabilities. AR 296. She was later employed as an assembler at Banner Engineering from 2000 to 2002, where she reportedly developed carpal tunnel. AR 84, 296. She also worked as a waitress, casino attendant, and a convenience store clerk previously. AR 296. She began working for Walmart in 2006 and was employed there at the time of her hearing with the ALJ. AR 82, 296. She had worked as a cashier and in the photo lab, but had been moved to a greeter position at the time of her hearing. AR 81, 94, 296. Phillips worked full time at Walmart until August 1, 2012,

3

when she reduced her schedule to 16 hours per week due primarily to her back pain. AR 85, 280. Records show that as of July 2015, Phillips was unemployed, but appears to have started working at a casino, perhaps around August of 2015. AR 16, 18.

### B. Phillips's Treatment History

#### 1. Medical and Medical-Psychiatric Treatment

The earliest records detailing Phillips's medical history in the Administrative Record are from Avera Queen of Peace Hospital. Phillips complained about ongoing problems with frequent stools, and on November 5, 2010, she underwent a colonoscopy. AR 496, 498. Dr. Aaron Baas performed the procedure, and listed a post-operative diagnosis of distal esophagitis, a greater than one centimeter rectosigmoid polyp, and chronic diarrhea. AR 498. Dr. Baas also indicated Phillips had a small hiatal hernia. AR 499. The final diagnosis from the pathology report indicated that the colon biopsies were compatible with microscopic colitis with focal features of collagenous colitis. AR 504.

Records from August and September of 2011 document a routine mammogram where it was observed that Phillips had two nodules on her breasts which were assessed as benign. AR 507–10. A mammogram performed in September of 2013 showed that the two nodules had remained stable since their discovery in 2011. AR 526.

On November 14, 2013, Phillips complained of having up to 12 loose stools a day with mucus, and wanted to set up a colonoscopy. AR 527. Dr. Baas performed the colonoscopy on December 19, 2013, and found no evidence of colon cancer or polyps, diverticular disease, active colitis, or arteriovenous malformation. AR 533. Random colon biopsies were taken to rule out microscopic or collagenous colitis. AR 533. The pathology report established the final diagnosis as collagenous colitis, which was consistent with the prior colon biopsies. AR 535.

4

Treatment records from Whiting Memorial Clinic document a September 2011 visit where Phillips complained of pain near her belly button, and it was noted that a hernia had been found during her recent colonoscopy. AR 429. She was referred to Dr. Howe to discuss possible surgery, though Phillips apparently cancelled this appointment due to its cost. AR 425, 429.

Phillips was seen by Lance S. Lim, M.D., on February 8, 2012, with complaints of pain in her lower back and legs which had been present for the previous few months, with increasing severity over the few days prior to her appointment. AR 425. She reported that the pain radiated into her left thigh, that she was taking Ibuprofen three times daily, and that the pain was most severe when she was at work and slightly relieved when she laid down. AR 425. In addition, she reported that her knees had been hurting for the last two to three years and that anti-inflammatory medications did not help. AR 425. She further reported headaches, chronic diarrhea, and on-and-off chest pain that began six months prior to her appointment. AR 425. Dr. Lim noted Phillips to be in no acute distress, with no tenderness in her back on palpitation and an euthymic mood. AR 426–27. Noting that her knees had crepitations, Dr. Lim prescribed Cyclobenzaprine[4] with a plan to switch to Tramadol[5] if that did not work. AR 428. Dr. Lim did not believe the chest pains were cardiac related, but was concerned about the headaches and scheduled a CT scan for the following week. AR 428. He also noted Phillips had no desire to stop smoking, but he explained to her the health risks and costs associated with the habit. AR 428.

---

[4] Cyclobenzaprine acts on the central nervous system to produce a muscle relaxant effect and thus relieve pain, stiffness, and discomfort caused by strains, sprains, or injuries to muscles. See Cyclobenzaprine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last updated March 1, 2017).

[5] Tramadol is an opioid analgesic used to relieve moderate to moderately severe pain. See Tramadol (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last updated March 1, 2017).

Phillips underwent a CT scan on February 16, 2012, which was read as normal with and without contrast. AR 466. Records in March and May of 2011 document medication refills for Citalopram,[6] Levothyroxine,[7] and Trazadone.[8] AR 424–25.

On May 22, 2012, Phillips was seen by Leonard Wonnenberg, PA-C, with complaints of increasing back pain over the past couple months. AR 422. She described the pain as being exacerbated with prolonged standing or sitting, indicated she was limited to standing no more than 6 hours daily, reported that the pain began two to four hours after working, and rated the pain as 8/10. AR 422. She explained that the pain began in the lower back and radiated into both hips, and had recently moved up to the upper thoracic area of her back. AR 422. On physical examination, Phillips had tenderness along the lower back in the lumbar and sacral areas along the paraspinous muscles, but no bony deformity and a straight leg raised was deferred. AR 423. Wonnenberg prescribed Tramadol for 30 days, Lotrisone,[9] and Alprazolam.[10] At that time, an X-ray and bone density scan were recommended, but Phillips deferred those options and continued self-treatment with rest, ice, and heat. AR 424.

---

[6] Citalopram is a selective serotonin reuptake inhibitor used to treat depression. See Citalopram (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980 (last updated March 1, 2017).

[7] Levothyroxine is used to treat hypothyroidism, a condition where the thyroid gland does not produce enough thyroid hormone. See Levothyroxine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/description/drg-20072133 (last updated March 1, 2017).

[8] Trazodone is an antidepressant thought to work by increasing the activity of serotonin in the brain. See Trazodone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last updated March 1, 2017).

[9] Lotrisone is a brand name for Betamethasone and Clotrimazole, which is a topical solution used to treat fungus infections. See Betamethasone and Clotrimazole (Topical Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/betamethasone-and-clotrimazole-topical-route/description/drg-20061704 (last updated March 1, 2017).

[10] Alprazolam is a benzodiazepine belonging to the group of medicines known as central nervous system depressants and is used to treat anxiety and panic disorder. See Alprazolam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/alprazolam-oral-route/description/drg-20061040 (last updated March 1, 2017).

On June 4, 2012, Phillips phoned PA Wonnenberg and reported that Tramadol was not helping with her back pain. AR 424. Wonnenberg ordered a prescription of Relafen[11] at that time. AR 424.

Phillips returned to PA Wonnenberg on June 22, 2012, and reported that the Relafen had not significantly improved her back pain. AR 418–19. She claimed her legs were fatigued, described again that her back pain went through her thighs with the left thigh experiencing more pain than the right, and claimed right medial knee pain with swelling and crepitus. AR 419. She was not experiencing abdominal pain, diarrhea, or constipation. AR 419. On physical examination, Wonnenberg noted some superior-medial point tenderness in Phillips's right knee with mild swelling, lumbosacral point tenderness, and mild pain on a straight leg raise, with more pain from her left leg than right. AR 419. Wonnenberg switched Phillips from Relafen to Mobic,[12] ordered lab work and an X-ray of her lumbosacral spine and knee, and scheduled a mammogram. AR 421. He noted that a course of steroids was declined by Phillips due to her concern of potential side effects. AR 421. An X-ray, performed that same day, demonstrated mild narrowing of the disc spaces throughout the lumbar spine, which brought up consideration of underlying degenerative disc changes. AR 464. Examination of the right knee was negative for an acute fracture or joint effusion. AR 464.

---

[11] Relafen is the brand name for Nabumetone, a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain and help relieve symptoms of arthritis. See Nabumetone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/nabumetone-oral-route/description/drg-20069686 (last updated March 1, 2017).

[12] Mobic is a brand name for Meloxicam, a nonsteroidal anti-inflammatory drug used to relieve the symptoms of arthritis. See Meloxicam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last updated March 1, 2017).

Phillips reported to PA Wonnenberg on July 6, 2012, that the Mobic was causing her to experience gas and cramping, and Wonnenberg switched her back to Tramadol. AR 418. During a call on July 31, 2012, he prescribed Norco[13] for Phillips's back and knee pain. AR 418.

Wonnenberg referred Phillips to Carl Huff, M.D., an orthopedic surgeon, on August 2, 2012. AR 417. Phillips met with Dr. Huff six days later and reported that she was miserable with pain, which she described as constant regardless of her activity or the amount of time she rested, and claimed that it had been worsening over the past six months. AR 599. Phillips reported that she had been relocated to the photo lab from her cashier position at Walmart, because the twisting and repetitive movements of the cashier position increased her back pain. AR 599. She also claimed that her right leg was weak at times. AR 599. Dr. Huff noted that, according to Phillips's provider, X-rays done the previous month were completely negative.[14] AR 599. At that time, Phillips's medications consisted of Citalopram, Levothyroxine, Norco, and Trazodone. AR 599. On physical examination, Dr. Huff noted that Phillips was able to rise with minimal difficulty and walked without a limp. AR 600. He noted moderate tenderness in the midline at L4 and L5 and observed that her paravertebral muscles were quite tender bilaterally. AR 600. With forward flexion, her fingertips reached midway between her knees and ankles, and she was noted to have paraspinal muscle spasm. AR 600. A straight leg raise caused low back pain radiating to the hip and thigh. AR 600. He noted pulses in her feet were normal and there was no muscle atrophy. AR 600. Dr. Huff ordered an MRI due to the claimed

---

[13] Norco is a brand name for a Hyrdocodone and Acetaminophen combination used to relieve moderate to moderately severe pain. See Hydrocodone and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last updated March 1, 2017).

[14] Dr. Huff appears to be referring to the June 22, 2012 X-rays ordered by PA Wonnenberg.

chronicity and intensity of her back pain and the apparent lack of response to conservative treatment. AR 601.

Phillips underwent an MRI on August 16, 2012, which revealed mild degenerative desiccation throughout the lumbar disc spaces as expected for Phillips's age, without significant disc space narrowing. AR 602. The impression of the reviewing radiologist was that Phillips had a normal lumbar spine for her age, and that the minimal degenerative disc desiccation was less than expected with no disc hernia or osteophyte. AR 602. Dr. Huff held a follow up appointment with Phillips on August 20, 2012, and explained her MRI was negative and normal for her age. AR 603. Phillips reported no change in her symptoms and no relief from Tramadol, muscle relaxers, or Hydrocodone.[15] AR 603. On physical examination, Phillips was noted to be tender at the L5 level and over both sacroiliac joints, and a straight leg raise to 90 degrees was negative on the left leg but caused back pain radiating into the thigh with the right leg. AR 604. Dr. Huff assessed Phillips with low back pain and inflammatory arthritis, and noted that because her pain was not explained by the results of the MRI, he would continue with further evaluation including various lab work. AR 604.

At a follow up appointment to discuss her lab results on August 29, 2012, Phillips reported no change in her symptoms of back and bilateral knee pain and believed that Tramadol and generic Flexeril[16] were not producing pain relief. AR 595. While most of her lab tests were normal or negative, her uric acid level was elevated consistent with gouty arthritis. AR 595. On physical examination, tenderness was limited to the sacroiliac joints, with mild tenderness of the

---

[15] Hydrocodone is used to relieve moderate to moderately severe pain. It is part of the group of medicines known as narcotic analgesics. See Hydrocodone and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last updated March 1, 2017).

[16] Flexeril is a brand name for Cyclobenzaprine. Supra note 4.

knees and ankles but no swelling was noted. AR 596. Phillips had full range of motion of the lumbar spine, hips, knees and ankles, and Dr. Huff assessed her with acute gouty arthropathy. AR 596. He prescribed Allopurinol[17] and Tramadol for pain, and Phillips was to follow up in eight weeks. AR 596.

Phillips had a follow up appointment with Dr. Huff on November 7, 2012. She reported being unable to tolerate Meloxicam,[18] believed the Tramadol and Allopurinol had not helped alleviate her pain, and reported being very tired of the constant pain. AR 606. Phillips stated that she was unable to continue working as a cashier and had just started as a greeter. AR 606. Despite reporting that her knees ached, Phillips had no mechanical symptoms and no swelling. AR 606. On physical examination of the thoracolumbar spine, Phillips was unable to bend forward to touch her toes and there was diminished segmentation of the lumbar spine. AR 607. Dr. Huff noted that the tenderness was primarily confined to the sacroiliac joint bilaterally, a straight leg raise test was negative, and her hip range of motion was normal without hip pain. AR. 607. A cortisone shot was administered to the sacroiliac joint, and Phillips was to return in three weeks. AR 607.

Phillips's final appointment with Dr. Huff for which records are present in the Administrative Record took place on December 21, 2012. Phillips reported feeling 75 percent better, though she described being able to work only four hours a day and felt limited with her back, often wearing a back brace. AR 608. She indicated her knees continued to bother her, but the Tramadol was helping. AR 608. Dr. Huff noted she had experienced dramatic pain relief with the cortisone injections of both sacroiliac joints and was almost asymptomatic. AR 608.

---

[17] Allopurinol is a xanthine oxidase inhibitor used to prevent or treat high uric acid levels in the blood. See Allopurinol (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/allopurinol-oral-route/description/drg-20075476 (last updated March 1, 2017).
[18] Supra note 12.

On physical examination, Phillips's sacroiliac joints were only minimally tender, and she could arise with minimal difficulty and walked without a limp. AR 608. Dr. Huff assessed Phillips with inflammatory arthritis with involvement of the bilateral sacroiliac joints and both knees, discussed limitations and therapeutic exercises with Phillips, and advised her to return if her symptoms worsened or persisted. AR 609.

Phillips's continued treating with PA Wonnenberg during the time she treated with Dr. Huff. On August 13, 2012, Phillips reported to Wonnenberg that she was experiencing right wrist pain that began with a popping sensation on the lateral aspect of her wrist with immediate pain following. AR 416. At the time of her appointment, she reported the pain was better, rating it as a 1–2/10, and a dull ache along the nonpalmar aspect of digits 2 and 3 of her right hand which she rated as a 3/10. AR 416. Wonnenberg advised Phillips not to work for a week and to be restricted to light duty upon return, wear a wrist splint, and alternate between Tylenol and Ibuprofen. AR 417. An addendum to this record from Wonnenberg indicated Phillips could return to work on "alternative duty and no work at the registry." AR 417.

Phillips returned to Wonnenberg on September 10, 2012, and reported both that the pain in her wrist was under much better control and that the wrist brace helped considerably. AR 415. Wonnenberg assessed Phillips with gout and advised her that she could return to work without restriction but should continue to wear the wrist brace. AR 416.

On September 26, 2012, Phillips saw Wonnenberg with complaints of right shoulder pain. She reported experiencing radiating right shoulder pain and a numb tingling in her right metacarpal spaces. AR 413. She reported that working in the fitting room relieved her pain to a degree and that she had stopped taking Meloxicam because of violent diarrhea and had not been using anti-inflammatory medications. AR 413. On physical examination, Wonnenberg noted

lateral right shoulder tenderness, slight weakness with arm abduction, minimal pain with internal and external rotation, and 5/5 strength bilaterally. AR 414. An empty can test was negative. AR 414. Wonnenberg believed Phillips to have an overuse injury and restricted Phillips from register work for three weeks, though she could return sooner as tolerated. AR 414. He recommended Ibuprofen to Phillips and scheduled her return visit in three weeks. AR 414.

During her follow up appointment on October 10, 2012, Phillips reported that working in the dressing room helped to prevent exacerbation of her shoulder and hand pain. AR 412. She described her pain as 2/10 that day, but claimed it was typically 3–4/10 at work. AR 412. On physical examination, Wonnenberg noted slight right shoulder pain over the supraspinatus muscle and deltoid area with empty can test against resistance. AR 413. No obvious edema, warmth, or deformities were noted. AR 413. Wonnenberg ordered a physical therapy assessment for her shoulder pain, advised Phillips to continue working the dressing room for a week while progressing back to register work with 1 to 2 hours a day, and suggested Phillips to continue taking Tylenol and Ibuprofen. AR 413.

Phillips attended physical therapy that same day where her therapist identified pain, range of motion, and strength as impairments, and noted she displayed tendonitis of the biceps. AR 394. Her therapist, Shane Hartman,[19] believed Phillips required skilled rehabilitation therapy in conjunction with a home exercise program, and recommended she attend therapy three times a week for four weeks. AR 394. When Phillips returned to therapy on October 24, 2012, she reported improvement but still had pain with certain "extreme" motions. AR 390. Hartman noted Phillips tolerated her therapy without complaints of pain or difficulty and advised she continue therapy. AR 391.

---

[19] The records from Pro PT are extremely difficult to read but it appears the therapist's name was Shane Hartman. AR 394.

Phillips returned to PA Wonnenberg on November 6, 2012, regarding her shoulder pain and stated she had attended four sessions of physical therapy, but did not attend the prior week. AR 410–11. She had switched to a greeter position at Walmart the prior weekend and described her pain as a 4/10 that day, and stated that Tramadol was helping somewhat but wanted Hydrocodone. AR 411. On physical examination, Wonnenberg noted mild tenderness on palpitation along the lateral aspect of the supraspinatus muscles, and an empty can test showed pain in the same area. AR 411. She had full range of motion with elbow flexion and extension and no pain with internal and external rotation. AR 411. Wonnenberg restricted her to lifting no more than 15 pounds and four-day work weeks at four hours per day. AR 412.

At her appointment with Wonnenberg on November 27, 2012, Phillips reported feeling "awesome" since she began working as a greeter and working 16 hour weeks, describing her pain at her appointment as a 1/10. AR 409. She reported doing her at-home exercises and attending physical therapy. AR 409. Wonnenberg recorded that a normal shoulder exam was unremarkable and indicated Phillips could return to work without restriction. AR 409–10.

Phillips next saw Wonnenberg on March 27, 2013, with complaints of heightened anxiety and back pain. AR 406. She attributed increased anxiety to her son seeing a counselor, and discussed how a new job cleaning apartments was exacerbating her back pain with activities like vacuuming, lifting heavy objects, bending, and general manual labor. AR 406. Wonnenberg noted lower lumbar tenderness extending into the upper gluteus region and sacroiliac region tenderness, no increased edema, no deformity, and normal muscle tone. AR 407. He assessed her with gout, recommended taking Aleve for her back pain, and ordered a refill of her anxiety medications. AR 407–08. Additionally, Wonnenberg supplied a note to Walmart detailing the limitations Phillips was subject to due to her anxiety. AR 408.

13

On August 7, 2013, Phillips was treated by Amanda Adams, PA-C, with complaints of worsening anxiety. Phillips stated that she had been under some stress recently because of issues with her son, but was doing ok now, though was drinking six beers a night and had trouble sleeping. AR 403. Phillips had a PHQ-9[20] score of 21, and Adams noted she was in no acute distress at that time. AR 404. Adams prescribed Fluoxetine[21] and Trazadone, recommended discontinuing Celexa[22] and starting Prozac.[23] AR 405. Adams also advised Phillips to stop drinking, to make an appointment with Community Counseling Services, and to return in two weeks for a follow up appointment. AR 404–05.

On August 21, 2013, Phillips reported that the Fluoxetine was not working and requested Citalopram. AR 401. She was feeling a lack of energy and reported missing a few days of work. AR 401. PA Adams assessed Phillips with anxiety and moderate recurrent major depression and prescribed Citalopram and Bupropion.[24] AR 402.

At her appointment on September 9, 2013, Phillips reported having more energy and a good reaction to Wellbutrin,[25] though was still having anxiety and claimed an increase in lower back pain recently, which Phillips attributed to her gout flaring up. AR 400. Adams found no

---

[20] The Patient Health Questionnaire, PHQ-9, is used to screen, diagnose, monitor, and measure the severity of depression. Scores of 5, 10, 15, and 20 represents mild, moderate, moderately severe and severe depression. Center for Quality Assessment and Improvement in Mental Health, available at http:// www.cqaimh.org/pdf/tool_phq9.pdf.

[21] Fluoxetine is an antidepressant belonging to the group of medicines known as selective serotonin reuptake inhibitors used to treat depression, obsessive compulsive disorder, bulimia nervosa, premenstrual dysphoric disorder, and panic disorder. See Fluoxetine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last updated March 1, 2017).

[22] Celexa is a brand name for Citalopram. Supra note 6.

[23] Prozac is a brand name for Fluoxetine. Supra note 21.

[24] Bupropion is used to treat depression and to prevent depression in patients with seasonal affective disorder. See Bupropion (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last updated March 1, 2017).

[25] Wellbutrin is a brand name for the drug Bupropion. Supra note 24.

14

tenderness on palpitation, and Phillips had an improved PHQ-9 score of 13. AR 400. Adams felt the back pain described by Phillips sounded more like sciatica than gout and recommended Phillips try home stretching exercises and icing the area, in addition to prescribing Buspar.[26] AR 401.

On October 2, 2013, Phillips reported having run out of Wellbutrin a week prior to her appointment and having stopped taking Statin[27] and Allopurinol because her last lipid panel and uric acid levels were normal. AR 398. Phillips indicated she had experienced no change in her anxiety level with Buspar, was anxious about an upcoming trip, and was hoping to get some anxiety medications and pain medications for increased back pain. AR 398. On physical examination, Adams noted tenderness on palpitation of the back. AR 398. Adams prescribed a week's dosage of Valium,[28] renewed Phillips's Hydrocodone, gave her a bottle of Wellbutrin, and advised that she restart her Statin and Allopurinol, though Phillips refused because she did not like taking medications. AR 399.

When Phillips saw Adams on December 2, 2013, she reported her anxiety and depression were under control with Wellbutrin and Citalopram, and that she had discontinued taking Buspar, deeming it unhelpful. AR 627. Phillips described how her anxiety caused her to leave

---

[26] Buspar is a brand name for Buspirone, which is used to treat anxiety disorder or relieve the symptoms of anxiety. See Buspirone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last updated March 1, 2017).
[27] Statins are a group of medicines called HMG-CoA reductase inhibitors that reduce the amount of cholesterol in the blood by blocking an enzyme in the body that is needed to make cholesterol. See Lovastatin (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lovastatin-oral-route/description/drg-20069029 (last updated March 1, 2017).
[28] Valium is a brand name for Diazepam, a drug used to relieve symptoms of anxiety and alcohol withdrawal. Diazepam is a benzodiazepine belonging to the group of medicines known as central nervous system depressants. See Diazepam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/diazepam-oral-route/description/drg-20072333 (last updated March 1, 2017).

her position at work and calm down in the bathroom, and also made her not want to leave her apartment to do things like shop for groceries and attend doctor appointments. AR 627. Phillips nevertheless had an improved PHQ-9 score of 10, and Adams renewed her Hydrocodone prescription, started her on Naprosyn[29] and gave her more Wellbutrin. AR 627. She advised Phillips to take two Trazadone at night if needed to help with sleep, and wanted her to return in two months. AR 627.

Phillips reported continued back pain, worsening anxiety and poor sleep at her appointment on January 31, 2014. AR 625. She reported having problems at work lately and was applying for disability. AR 625. Phillips had run out of Wellbutrin the week prior and had decreased her alcohol usage. AR 625. Adams noted Phillips was in no acute distress, had an increased PHQ-9 score of 17, and was assessed with lower back pain, anxiety, and chronic major depression. AR 625–26. Adams refilled Phillips's Hydrocodone, renewed her Trazadone, and discontinued Bupropion and Naprosyn. AR 626. Adams strongly encouraged Phillips to make an appointment with a counselor, but Phillips indicated cost was an issue. AR 626.

Phillips was treated by Terri Groves, PA-C, on February 2, 2014, for severe lower back pain. Phillips described coughing the day before which caused her back to feel like it "exploded." AR 481. Groves found Phillips to be in no acute distress, found her range of motion of the lumbar spine was decreased due to pain and stiffness, and found no pain on palpitation of the lumbar spine, though noted the right lumbar muscles were taut. AR 481. She prescribed 200 mg of Ibuprofen three times daily, Hydrocodone in the morning and night, and

---

[29] Naprosyn is a brand name for the drug Naproxen, which is a nonsteroidal anti-inflammatory drug used to relieve symptoms of arthritis. See Naproxen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (last updated March 1, 2017).

advised no work for the next two days. AR 482. She considered a Toradol[30] injection but noted Phillips was sensitive to Mobic. AR 482.

Phillips returned to PA Adams on March 10, 2014, and described feeling that her anxiety and depression were under control and that Trazodone was helping her sleep. AR 479. However, Phillips did not think her pain meds worked and only the "steroid injection" from Dr. Huff seemed to help. AR 479. She described how the back pain would shoot down the back of her legs, and her lumbosacral spine was mildly tender on palpitation. AR 479–80. Adams renewed prescriptions for Allopurinol and Hydrocodone, ordered various labs, noted that she wanted Phillips to try Gabapentin[31] for her back pain, and planned to consult with Dr. Lim on whether Phillips would benefit from a steroid injection. AR 480. Pathology reports from the labs indicated Phillips's cholesterol and uric acid levels were high. AR 492–93.

Phillips was treated by Dr. Lim on April 17, 2014, requesting a cortisone shot for her back pain. AR 575. She stated the previous shot received from Dr. Huff helped for about two weeks, her hydrocodone was not helping her at this point, and the acetaminophen was bothering her stomach. AR 575. Phillips rated her pain as a 4/10 but indicated that even regular housework would increase it to a 10/10 or close it. AR 575. Dr. Lim noted tenderness on palpitation of the lower back of the right paraspinal region and muscle spasm. AR 575. He

---

[30] Toradol is a brand name for the drug Keterolac, which is used to relieve moderately severe pain. Keterolac is a nonsteroidal anti-inflammatory drug. See Keterolac (Oral Route, Injection Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/ketorolac-oral-route-injection-route/description/drg-20066882 (last updated March 1, 2017).

[31] Gabapentin is an anticonvulsant that works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system. See Gabapentin (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last updated March 1, 2017).

administered a cortisone shot and switched Phillips's Hydrocodone prescription to Oxycodone.[32] AR 576.

Phillips saw PA Adams the following day on April 18, 2014, and reported her back pain was significantly improved since the shot. AR 573. She also complained of neck pain radiating into her shoulder and explained that a chiropractor had previously advised her that she had a herniated disc. AR 573. On physical examination, Adams found mild tenderness on palpitation to the left side of Phillips's neck and tenderness on palpitation to the cervical spine, but no weakness. AR 574. Adams discontinued the Gabapentin and Ibuprofen 200 mg and refilled her Wellbutrin prescription. AR 574. Phillips was advised to continue with her current medication regimen and to return in three months. AR 574. She was also referred to physical therapy for her neck, but Phillips appears to have cancelled her appointment. AR 574.

When Phillips returned to Dr. Lim on June 19, 2014, she reported that the shot had only helped for a few days and rated her back pain as 5/10, and said that minimal activity could increase her pain level to 10/10. AR 571. Phillips stated that taking two Oxycodone helped, but reported she had not taken any in a month. AR 571. Dr. Lim noted tenderness on palpitation of the back and increased her quantity of Oxycodone but cautioned Phillips to make the dosage last for 30 days. AR 572. He also renewed her Naprosyn, but emphasized the need to take anti-inflammatory medications and advised her to continue with over-the-counter medicine and conservative therapy. AR 572.

Phillips returned to Adams on August 8, 2014, for a recheck of her depression. She described having two episodes of severe abdominal pain in the previous ten days which she

---

[32] Oxycodone belongs to the group of medicines called narcotic analgesics, and acts on the central nervous system to relieve pain. See Oxycodone and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last updated March 1, 2017).

believed was caused by Naproxen. AR 569. She reported discontinuing Naproxen and Omeprazole,[33] and indicated she felt better than she had the previous three days. AR 569. She requested discontinuing Wellbutrin because she did not believe it helped and was fine using only Celexa. AR 569. Adams noted Phillips was in no acute distress, had some mild direct epigastric tenderness on palpitation, and assessed her with gout, anxiety, and epigastric pain. AR 570. Adams restarted Phillips on Omeprazole, discontinued her Wellbutrin and Naproxen, and directed her to take Carafate[34] as needed for stomach pain. AR 570.

Phillips saw Dr. Lim on October 15, 2014, for back pain and described chronic pain that she rated a 7/10 and that standing, sitting, or walking would push her pain to 8–9/10. AR 565. Phillips also reported having restarted Wellbutrin because her depression had been increasing, and stated she was currently seeing a counselor[35] but had only one session left. AR 565. Phillips described feeling tired, depressed, and hopeless for the last two weeks. AR 565. Dr. Lim described her mood as euthymic and her PHQ-9 score was 16. AR 566. He refilled her Oxycodone, increased her dosage to 100 tablets per month, and directed her to return in three months. AR 566. She was encouraged to see a Dr. Chrisopherson, but Phillips declined because she felt her depression was getting better. AR 566.

---

[33] Omeprazole is proton pump inhibitor that decreases the amount of acid produced by the stomach. It is used in combination with Aspirin to treat patients who need Aspirin for heart and blood vessel problems and who are at risk of developing stomach ulcers caused by Aspirin. See Aspirin and Omeprazole (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/aspirin-and-omeprazole-oral-route/description/drg-20312492 (last updated March 1, 2017).

[34] Carafate is a brand name for the drug Sucralfate, which is used to treat duodenal ulcers by forming a coating over the ulcer. See Sucralfate (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/sucralfate-oral-route/description/drg-20066120 (last updated March 1, 2017).

[35] Phillips's counseling records are detailed below.

On January 14, 2015, Phillips reported to Dr. Lim that her symptoms were essentially the same and that she was suffering from moderate pain to which she could not give a number. AR 563. Dr. Lim renewed her Oxycodone prescription and advised her to return in three months. AR 564.

On March 10, 2015, Phillips saw PA Adams for a pap smear and to discuss her depression. Phillips indicated she had recently lost her insurance and was struggling to pay for her medications. AR 560. Phillips was currently on Wellbutrin XR which was helpful but expensive, so Adams changed her to standard Wellbutrin. AR 560–61. Phillips was to inform Adams when she ran out of Celexa at which point Adams would give her samples of Brintellix.[36] AR 561. Adams apparently then wrote a Brintellix prescription for Phillips on April 2, 2015. AR 648.

Phillips attended an appointment with Dr. Lim on April 15, 2015, for pain management and to discuss her disability claim. Phillips stated that on "lazy days" her pain averaged a 3–4/10, but that at the end of three hours of work she was around an 8/10 which easily increased to a 10/10. AR 593. She discussed how she felt anxious outside of her environment, especially around rowdy children and people, and described her wish to be in the quietest part of the store while at work. AR 593. In renewing her Oxycodone, Dr. Lim noted that Phillips's back pain was "the same" as it had been and that he did not "envision giving her higher doses [of pain medications] at least in the near future." AR 594. He further stated that "I can't envision her able to complete an 8 hour shift at work." AR 594. Regarding her anxiety, Dr. Lim stated that "As long as patient is in a controlled environment, she will probably be fine. No changes in

---

[36] Brintellix is a brand name for the antidepressant Vortioxetine, which is a selective serotonin reuptake inhibitor used to treat depression. See Vortioxetine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/vortioxetine-oral-route/description/drg-20061387 (last updated March 1, 2017).

meds needed." AR 594. Dr. Lim also filled out paperwork for Phillips's lawyer for her disability claim. AR 594.

Phillips again saw Dr. Lim on July 15, 2015, and explained that she was now unemployed and had been denied disability, though was appealing that decision. AR 18. Phillips stated she was trying to find part-time work and that her pain was at a 4/10, though housework brought it to 8/10, especially bending. AR 18. She could garden for about an hour before "maxing out" and needing to rest. AR 18. Dr. Lim noted that her back was tender on palpitation and identified no muscle spasm. AR 19. Dr. Lim refilled her Oxycodone prescription and discussed Phillips's concern that he had not been specific enough on a question about whether she could climb ladders for her disability claim.[37] AR 19. Dr. Lim noted that Phillips could not climb ladders at all and advised Phillips to return in three months. AR 19.

At a follow up appointment on October 14, 2015, Phillips reported that her pain was the same and normally around a 4/10, though was currently at 7/10 because she had helped her neighbor the previous day with various tasks. AR 17. She brought paperwork for her disability appeal and explained to Dr. Lim that she was visiting her sister in Texas for two weeks in December which made her anxious and wanted to bring her cat. AR 17. She also described anterior pain in her thighs for the last few months. AR 17. Dr. Lim noted tenderness on palpitation of the right paraspinal region and maintained her prescription of Oxycodone. AR 18. He wrote a note to United Airlines for Phillips to bring her cat on the plane, noted that her anxiety was "essentially fine as long as she is in her usual environment," and indicated that he may prescribe Diazepam for her flight. AR 18.

---

[37] Dr. Lim's Physical Residual Functional Capacity assessment actually did state that Phillips was "never" to climb ladders and scaffolds. AR 591.

Records from Phillips's appointment with Dr. Lim on January 13, 2016, state that she started working at a casino in "August of last year" for four hours on Mondays and Thursdays. AR 16. Phillips stated that it had actually helped her back pain and reported her current pain level to be a 3/10, though stated it averaged 6–7/10. AR 16. Dr. Lim noted tenderness on palpitation of the right paraspinal region, renewed her Oxycodone, and advised her to return in three months. AR 16.

Phillips was treated by PA Adams for stomach pain, bloating and medication refills on April 12, 2016. Phillips reported doing well with her depression and anxiety, being happy with her Wellbutrin and Celexa, and not having a gout flare up recently. AR 14. Phillips described sometimes having trouble making it to the bathroom on time, but did not notice blood in her stool. AR 14. She reported that her stomach pain was not affected by food, she often felt bloated, and Omeprazole did not help. AR 14. Adams assessed Phillips with gout-unspecified, hypothyroidism-unspecified, major depressive disorder-recurrent, unspecified, anxiety disorder-unspecified, and pure hypercholesterolemia. AR 15. Adams renewed prescriptions for Levothyroxine, Citalopram, Allopurinol, Wellbutrin XL, and dispensed Bentyl[38] for abdominal pain. AR 15.

Phillips saw Dr. Lim on April 13, 2016, for her back pain. Phillips reported doing well until four weeks ago when her back pain suddenly started getting worse. AR 13. She described it as radiating down both thighs in the posterior area, starting as a dull ache and then becoming a

---

[38] Bently is a brand name for the anticholinergics and antispasmodics, which are a group of medicines that include the natural belladonna alkaloids. It is used to relieve cramps or spasms of the stomach, intestines, or bladder. See Anticholinergics and Antispasmodics (Oral Route, Parenteral Route, Rectal Route, Transdermal Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/anticholinergics-and-antispasmodics-oral-route-parenteral-route-rectal-route-transdermal-route/description/drg-20070312 (last updated March 1, 2017).

shooting pain like a spasm, with an average pain level of 5–6/10, and described her current pain level as 5/10. AR 13. Dr. Lim noted no back tenderness on palpitation and restarted a prescription for Cyclobenzaprine and increased the quantity of her Oxycodone. AR 14. Phillips also mentioned that she planned on doing more gardening that year. AR 14.

Phillips's final appointment with Dr. Lim for which records exist took place on July 13, 2016. Phillips reported experiencing right upper back and mid back pain, which bothered her more than her chronic lower back pain; Phillips did not know what caused it. AR 11. On physical examination, Dr. Lim noted her upper and middle back exhibited tenderness on palpitation of the right side, and her lower back exhibited tenderness on palpitation, and no muscle spasms were detected. AR 11. Regarding her lower back pain, Dr. Lim recorded it not bothering Phillips as much as before and was a 3/10 that day. AR 12. Phillips reported pain in her right shoulder that she would treat with over-the-counter analgesic balms and creams, as well as heat and ice. AR 11. Dr. Lim discontinued her Cyclobenzaprine prescription and renewed her Oxycodone. AR 11.

PA Adams completed a Mental Residual Functional Capacity (RFC) assessment about Phillips on March 26, 2015. AR 587–89. The assessment asked Adams to rate Phillips's limitations in various mental functioning categories, with ratings of "Not Significantly Limited," "Mildly Limited," "Moderately Limited," and "Markedly Limited." Mildly limited ratings were to be given for an impairment which "slightly limits the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." AR 587. Moderately limited ratings were to be given for impairments that "more than slightly" interfered with the individual's ability to conduct the activity on a sustained and regular basis. AR 587. Adams rated Phillips as mildly or moderately

23

limited in abilities under two categories of mental functioning. Under "Sustained Concentration and Persistence," Adams rated Phillips as mildly limited both in her ability to work in coordination with or proximity to others without getting distracted and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 588. Under "Social Interaction," Adams rated Phillips as mildly limited in both her ability to ask simple questions and request assistance and her ability to accept instructions and respond appropriately to criticism from supervisors. AR 588. Adams rated Phillips as moderately limited in both her ability to interact appropriately with the general public and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. AR 588. Adams rated Phillips as not significantly limited in all other abilities. AR 587–89. In her remarks, Adams noted that Phillips has social anxiety which limits her ability to work with others despite medication. AR 589.

Dr. Lim completed a physical RFC assessment for Phillips on April 15, 2015. AR 590–92. The assessment required Dr. Lim to rate various physical limitations with a rating of "Rarely" (1 to 5 percent of an 8 hour workday), "Occasionally" (6 to 33 percent of an 8 hour workday), "Frequently" (34 to 66 percent of an 8 hour workday), "never," or no limit. AR 590–91. Dr. Lim rated Phillips as able to occasionally lift or carry less than 10 pounds and rarely lift or carry 10 pounds. AR 590. Dr. Lim rated Phillips's ability to stand or walk with normal breaks for a total of "less than two hours" in an eight hour workday as "rarely," and not able to do so for "at least two hours" or "about six hours" in an eight hour workday. AR 590. Dr. Lim rated Phillips' ability to sit with normal breaks for a total of "less than two hours" in an eight hour workday as "rarely," and not able to do so for "less than about six hours" or "about six

hours" in an eight hour workday. AR 590. He also noted she was frequently required to "periodically alternate between sitting and standing to relieve pain or discomfort." AR 590. Dr. Lim noted that she was limited in her upper and lower extremities for purposes of pushing and pulling, that working with her lower extremities would increase her lower back pain, and that she was able to work more with her upper extremities, "but not a whole lot more than [with her] lower extremities." AR 591. Under postural limitations, Dr. Lim rated Phillips as never able to climb ladders and scaffolds, kneel or crouch; able to stoop five percent of the time; and able to balance and climb ramps and stairs 10 percent of the time. AR 591. Under manipulative limitations, Dr. Lim rated Phillips as limited to 33 percent in reaching, handling, fingering, and feeling, and stated that Phillips "[h]ad bilateral carpal tunnel surgery and hands are still weak despite surgery." AR 591. Under Environmental Limitations, Dr. Lim noted that Phillips should avoid moderate exposure to noise and annotated that this was due to her anxiety. AR 592.

After Phillips was found not disabled and denied disability benefits, her counsel obtained a letter from Dr. Lim seeking clarification of his physical RFC assessment. The letter first asked Dr. Lim if the limitations he provided represented his opinion of Phillips's limitations if she were to attempt full-time sustained competitive work and not the limitations she might have if she only worked part-time or in a non-competitive situation, to which he responded yes. AR 676. Dr. Lim responded affirmatively to a question asking if Phillips's symptoms would increase if she attempted sustained full-time work and that increased symptoms would limit her further than noted in the assessment. AR 678. At the end of the letter, Dr. Lim stated that "I would like to reiterate that Kathy Phillips has NOT been able to physically and mentally work full time (8 hours/day x 5 days a week) for several years. She has hardly been able to finish PART-time

work (4 hrs/day x 4 days). It is UNLIKELY that she will be able to do a FULL time schedule. This is what I had based my opinions on in the past." AR 678 (emphasis in original).

### 2. Community Counseling Service Records

Records from Community Counseling Services begin on November 1, 2012, when Phillips met with Beth Kelsey, Ed.D., for what appears the only time. Kelsey noted that Phillips's affect was blunted and mood was anxious, and commented that Phillips verbalized an awareness of her problems. AR 382. Her judgment was rated as fair, she displayed poor frustration tolerance, but she was able to maintain focus. AR 382. Kelsey noted that Phillips had become agoraphobic and was seeking help with her anxiety, reporting that she was drinking a lot, hated appointments and just wants to stay home in her apartment. AR 382.

The next counseling session for which records exist took place on May 16, 2014, with Tammy Dramstad, LCSW. Dramstad discussed with Phillips her family history, and Phillips described her anxiety as a ten at the time of her appointment, commenting that it only lowers to a seven. AR 655. Phillips described her depression level as an eight and stated it had been better since she began taking anti-depression medications. AR 655. Phillips explained that her anxiety causes her to have racing thoughts and palpitations and a feeling of just needing to "get out of here," which occurs on a daily basis. AR 655. She further described how crying children at Walmart cause her to hide in the bathroom, how she can have anxiety attacks at home alone, how she needs everything in her home to be orderly, and how she uses marijuana to calm down. AR 655. Dramstad diagnosed Phillips with generalized anxiety disorder, obsessive compulsive disorder with poor insight, alcohol dependence with psychological dependence, and cannabis abuse along Axis I, and hypertension, hypothyroidism, and lumbago along Axis III. AR 656.

Dramstad taught Phillips anxiety reduction skills and gave her a Global Assessment of Functioning (GAF) score of 51.[39] AR 656–57.

At Phillips's appointment on May 23, 2014, Dramstad noted her mental status was relatively normal, finding her affect to be appropriate and an ability to attend and maintain focus. AR 658. Dramstad taught Phillips to use progressive relaxation and urged her to employ the technique twice daily, and gave her the first section of the Cognitive Behavioral Therapy (CBT) manual to complete. AR 658. Dramstad noted the effectiveness of the interventions was high as Phillips stated the progressive relaxation helped reduce her anxiety and was something she could continue using in the future. AR 658.

On May 30, 2014, Dramstad continued with the same therapeutic techniques employed in their prior session and again noted the effectiveness was high. AR 660. Phillips felt that things they were working on "make sense" and was starting to look at things from a different perspective. AR 660. Dramstad noted that Phillips took a proactive stance and calmly talked with her neighbor regarding an issue with a parking space, and Phillips stated her anxiety had been better over the last week. AR 660. Dramstad encouraged Phillips to continue employing progressive relaxation twice daily and encouraged her to complete section two of the CBT manual. AR 660.

Phillips returned to counseling on June 20, 2014, and was evaluated with the same mental status as before. AR 662. Dramstad reviewed the CBT skills with Phillips and again noted the effectiveness to be high, stating that Phillips had a good understanding of cognitive distortions and how Phillips uses them to perceive her work negatively. AR 662. Phillips felt happy with

---

[39] "The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function." Hurd v. Astrue, 621 F.3d 734, 736 (8th Cir. 2010). Phillips's score of 51 at that time was in the "moderate symptoms" range.

the way her situation with her neighbor turned out and reported attending several community events since her last session that gave her a "happy feeling." AR 662. She further reported her anxiety had been better over the last few weeks and was using progressive relaxation throughout the day. AR 662.

Dramstad and Phillips discussed her alcohol consumption on June 27, 2014, and continued reviewing CBT skills. AR 664. The effectiveness of the therapy was again rated as high, as Phillips considered how her drinking was a habit she no longer enjoyed. AR 664. Phillips felt that her use of CBT skills was influencing the way other people responded to her, and told a story of how a customer had recently written to Walmart about a pleasant experience with Phillips which led to recognition from her boss and fellow employees. AR 664. Phillips had challenged herself to attend community events and found joy in doing so. AR 664. She reported her anxiety was better over the previous weeks and was continuing to use progressive relaxation intermittently. AR 664.

On July 3, 2014, Dramstad continued teaching and reviewing CBT techniques with Phillips and noted the effectiveness was high. AR 666. Phillips was able to consider "doing something different" with individuals she was struggling with at work to change the dynamic of their relationship, and further reported her relationship with her mother was improving and the two of them were "getting out and doing things together." AR 666. Phillips was considering reducing her alcohol consumption, and Dramstad praised the changes Phillips was making in her life. AR 666.

Dramstad rated the effectiveness of therapy as high again on July 11, 2014. AR 668. She noted Phillips was able to distinguish things in her life she could not change and verbalized awareness that she only had the power to change herself. AR 668. Dramstad encouraged

28

Phillips to continue employing progressive relaxation twice daily and to complete the third section of the CBT manual. AR 668.

Phillips's final counseling session took place on July 18, 2014. Dramstad again taught and reviewed CBT skills with Phillips and noted the effectiveness of the therapy was high. AR 670. Dramstad noted Phillips was able to look at different ways to change her behaviors without expecting others to change theirs, and Phillips stated she felt reinvested in the changes she was making to address her depression and anxiety. AR 670.

Dramstad signed a therapist-initiated discharge on August 14, 2014. AR 672. Under "discharge condition," Dramstad noted significant improvement, and under "Reason" stated that Phillips was doing well and no longer felt therapy was needed. AR 670.

Dramstad completed a mental RFC assessment questionnaire about Phillips on April 29, 2015, and rated Phillips as more limited than Adams had in her own assessment. Under "Understanding and Memory," Dramstad rated Phillips as mildly limited in her ability to understand and remember detailed instructions. AR 621. Under "Sustained Concentration and Persistence," Dramstad rated Phillips as mildly limited in her ability to carry out short and simple instructions, her ability to carry out detailed instructions, her ability to sustain an ordinary routine without special supervision, and her ability to make simple work-related decisions. AR 621–22. She rated Phillips as moderately limited in her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination with or in proximity to others without being distracted by them, and her ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 622. Under

"Social Interaction," Dramstad rated Phillips as mildly limited in her ability to interact appropriately with the general public and her ability to ask simple questions or request assistance, and markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors. AR 622. Finally, under "Adaptation," Dramstad rated Phillips as markedly limited in her ability to respond appropriately to changes in the work setting and her ability to travel to unfamiliar places or use public transportation, while rating her as moderately limited in her ability to set realistic goals or make plans independently of others. AR 623.

### C. Other Relevant Records

The Administrative Record also contains several records that were submitted as part of Phillips's disability claim that are not from treatment providers.

Phillips submitted a number of Walmart Family and Medical Leave Act (FMLA) request forms with corresponding healthcare provider certification records. AR 339–57. The earliest record is a medical certification form signed by Terri Groves and Dr. Lim on February 10, 2010, indicating Phillips had debilitating anxiety that would cause her to experience an episode every two to three months that would last three to five days. AR 352–53. Phillips was approved for intermittent FMLA leave on October 6, 2010, because of her struggles with anxiety and panic attacks. AR 355–57. Dr. Lim completed the medical portion, forecasting that Phillips would have two episodes per month with a four to six hour duration. AR 357. Walmart apparently approved Phillips to take intermittent leave between September 27, 2010, and March 31, 2011. AR 354.

Phillips submitted another request for intermittent leave from January 28, 2010, to January 28, 2011, and Dr. Lim completed the medical certification form indicating that Phillips would likely have two episodes per month with a four to six hour duration. AR 346–47, 349.

Phillips submitted another request for intermittent leave from May 10, 2011, to July 31, 2011. AR 339. Dr. Lim completed a medical certification form which indicated that Phillips had been referred to Dr. Christopherson in psychiatry. AR 341–42. From the notes on the form, Phillips reportedly was having panic attacks that required her to take medication immediately, and Dr. Lim noted that Phillips would need to leave work and allow two to three hours for such an episode to resolve. AR 341. Dr. Lim anticipated Phillips would undergo these episodes one to two times per week with a duration of four to six hours. AR 342. Dr. Lim also sent a letter to Walmart on June 13, 2011, indicating he had advised Phillips to take a temporary leave of absence because her depression and anxiety had been getting worse despite adjustments in her medications. AR 343. At the time he wrote the letter, Phillips had apparently been absent from work since May 26, 2011, and he advised her to not return until the end of July, 2011, unless her psychiatrist told her otherwise. AR 343.

On January 9, 2012, Phillips submitted a form to Walmart indicating she could only work 16 hours per week at no more than four hours per day. AR 363. On July 22, 2014, Phillips requested her shifts not be scheduled four days in a row. AR 362.

The Administrative Record also includes attendance records from Walmart which are quite difficult to read and decipher. One record appears to be a six month rolling average of attendance. AR 364. The records appear to show Phillips was absent from work 29 times between 2012 and 2015, and left work early eight times between 2014 and 2015.[40] AR 364–75. All of these absences, some apparently under FMLA authorization and some not, occurred after Phillips's alleged disability onset date of August 1, 2012.

---

[40] Phillips cited 19 instances of early departures in her brief. Doc. 16 at 23. This Court believes she may have double counted entries found at AR 373 which seem to reflect early departures accounted for at AR 372.

31

Phillips submitted a function report to the Commissioner on October 16, 2013, detailing her condition. AR 304–11. She reported pain "24-7" and that everything she did caused her more pain. AR 304. She claimed that because her colitis required her to run to the bathroom constantly she was afraid to go anywhere, and that her anxiety was set off "by anything and nothing in particular." AR 304. Phillips described her daily activities, which include regular household chores, going up and down stairs, running errands, taking short walks, and stretches. AR 305. In response to a question regarding what activities she could do before the onset of her limitations, Phillips responded with "[e]veryday life, carry, lift, push, pull and bend, and go out in public, like community events, family events, etc." AR 305. She reported preparing mostly frozen foods for meals, and at times has to take a break, sit down, or stretch during preparation, or run to the bathroom. AR 306. She recorded that she did all regular household chores, but because of her need for breaks they could take all day. AR 306. She reported doing her own shopping, listed general hobbies, and noted she visits with neighbors, her mother, and the public at social activities, though she claimed spending 90 percent of her time at home. AR 307–09. Phillips recorded that she follows written and spoken instructions well, but does not handle stress and changes in routine well. AR 309–10. Phillips also reported that her apartment is her comfort zone, that she cannot handle being around a lot of people for long periods of time, and that she is "pretty much miserable all the time." AR 311.

Greg Erickson, M.D., a state agency physician, completed a disability determination of Phillips for her disability claim at the initial level on January 3, 2014. AR 116–139. Dr. Erickson listed Phillips's medically determinable impairments as: spine disorders-rated severe; inflammatory bowel disease-rated non-severe; disorders of muscle, ligament, and fascia-rated as severe; anxiety disorders-rated as severe; affective disorders-rated as non-severe; and substance

addiction disorders-rated as non-severe. AR 121–22. A narrative explanation under the "Psychiatric Review Technique" section of the evaluation characterized Phillips's anxiety and depression as non-severe, and explained that she is treated with medications from her primary care provider and does not see mental health personnel.[41] AR 122, 134. Dr. Erickson found Phillips to be only partially credible, opining that she overstated her pain and difficulties compared to the medical evidence of record, which indicated her medications and treatment were improving her symptoms and that she was attaining a better quality of life. AR 123.

Dr. Erickson's evaluation includes a physical RFC which listed Phillips's exertional limitations due to her history of low back pain and overuse strain of her wrist and shoulder as: occasionally lifting 25 pounds; frequently lifting 20 pounds; and sitting and standing about six hours out of an eight hour workday. AR 124. For postural limitations, Phillips was limited to frequently climbing ladders, stooping, and crouching. AR 124. Under manipulative limitations, Phillips was limited in fingering and overhead reaching due to her history of wrist strain and overuse strain of the shoulder. AR 125. Dr. Erickson noted that the allegation of ulcerative colitis was not supported by the present medical records and that records for a November 2013 colonoscopy were not present. AR 125. Though he did not find this to be a severe physical limitation, he did recommend that a bathroom facility be available at work. AR 125. The final determination was that Phillips was not disabled and could perform work at a medium exertional level. AR 126.

A second disability determination report was done by Stuart Lerman, M.D., on April 17, 2014, prior to the Commissioner's reconsideration of Phillips's disability claim. AR 140–167. Based on a review of medical records regarding her depression and anxiety, Dr. Lerman noted

---

[41] It appears that the Psychiatric Review Technique portion was completed by S. Richard Gunn, Ph.D., as his signature appears in this section, dated December 20, 2013. AR 122, 135.

that although Phillips's symptoms had waxed and waned, her most recent records indicated her conditions were under fairly good control with medications; that a brief period of increased depression was attributable to running out of medications; and that as of March 10, 2014, Phillips felt her depression and anxiety were under control. AR 145. Her mental conditions were determined to be non-severe. AR 146. Under the Psychiatric Review Technique,[42] it was noted that medical evidence of record did not reveal significant signs, symptoms, or laboratory findings to support a medically determinable impairment of depression, and further noted that Phillips's allegations of her limitations were not entirely credible. AR 147. The report again states that her mental limitations are non-severe. AR 147. Curiously, once again the report lists the same medically determinable impairments and severity ratings as the previous report, which contradict the narrative explanations listed in the report. See AR 121–22, 146–47. The physical RFC differed slightly from the previous evaluation; Phillips was limited to occasionally lifting 20 pounds rather than 25 pounds; frequently lifting or carrying 10 pounds rather than 20 pounds; and never climbing ladders and frequently kneeling, crouching, and balancing. AR 149–50. Phillips was again determined to be not disabled, but now rated as able to perform work at a light exertional level. AR 152.

Finally, Phillips submitted several letters that are part of the Administrative Record. The first letter is from a James Bryant dated April 19, 2015. AR 612. Bryant stated that he and Phillips had been coworkers at Walmart for two years as people greeters, and that Phillips had a hard time dealing with "the people situation" and always excused herself from working the grocery side entrance at Walmart because there were more customers on that side. AR 612. Bryant reported witnessing several occasions where Phillips's anxiety level caused her to have to

---

[42] It appears that the Psychiatric Review Technique was completed by Mark Dilger, M.D., as his signature appears in this section, dated April 11, 2014. AR 147.

excuse herself and leave the designated work area. AR 612. A letter from Jim Stanley, dated April 22, 2015, stated that he has known Phillips for 30 years and knew her to be a very outgoing person, but that in the last several years she had become reclusive. AR 611. A letter dated April 25, 2015, from a Marvy Larson[43] stated that Phillips's anxiety causes her to be homebound and described how her daily back pain causes her to have to switch positions constantly to alleviate her pain. AR 614. A letter from Michelle Sexton, dated April 20, 2015, stated that she had worked with Phillips for four years and witnessed several of her anxiety and panic attacks. AR 615. Sexton stated that Phillips "would become anxious, then start to panic and then shake. She then couldn't function to do her job, she would then start to cry and kind of have a meltdown. She would then have to leave work." AR 615. A letter from Raquel Barden,[44] dated April 24, 2015, stated that he has known Phillips for nine years. AR 616. Barden's narrative describes Phillips as needing to know the schedule and general plans, and reacting very negatively to changes. AR 616. A letter from LaVerne Knouse, dated April 23, 2015, stated that he and Phillips have been employed together for four years and that she has displayed progressing back pain and anxiety. AR 617. Knouse wrote that on several occasions Phillips has been visibly upset and retreated to the bathroom to "hide from the chaos of the store." AR 617. Finally a letter dated April 21, 2015, with an illegible signature described an episode where Phillips had visited that person's house and suddenly needed to go home, but Phillips did not apparently state her reasons for departing. AR 618.

---

[43] During her hearing testimony, Phillips stated that Marvy Larson is a friend. AR 101.
[44] During her hearing testimony, Phillips stated that Raquel Barden is a former coworker and a friend of some years. AR 101.

## D. Testimony During Evidentiary Hearing

The ALJ conducted an evidentiary hearing on May 12, 2015. AR 77. Phillips appeared with her attorney and a vocational expert joined by telephone. AR 77.

Phillips testified that she reduced her schedule to part-time work in August of 2011 and attempted to do sales floor work but found it very stressful because of the lack of consistent duties. AR 81. She testified to developing carpal tunnel and plantar fasciitis while working at Banner Engineering where she did small assembly and soldering work. AR 84. Phillips testified that she reduced her hours at Walmart due to back pain and explained that her anxiety had caused her to take a lot of leave. AR 85–86. She also testified that her back pain radiates across her back and into her hips, and that besides the cortisone injections she had received from Dr. Huff, her treatment consisted mainly of stretches of her own creation and a TENS machine, neither of which were very effective. AR 86–87.

Regarding the severity of her pain, Phillips testified that it would be a six from sitting too long, that she cannot sit in a chair more than an hour or so, and that she has to get up and move around. AR 88–89. She further testified to experiencing a lot of pain after three hours of standing, though it really starts after the first hour. AR 89. Phillips testified that when she goes on break, it takes almost everything she has to get back to her work position. AR 90. She testified that she is limited to carrying a maximum of 20 pounds for a short time, that she could not pull or push that same weight, and that she takes Allopurinol for gout and Oxycodone for pain. AR 91. Phillips testified that she does not have the same strength in her hands as before her carpal tunnel surgery, and that she cannot do small things repeatedly like typing. AR 92. Phillips also said that her legs ache all the time from the knees up. AR 93.

Regarding her anxiety, Phillips testified that people in general, including coworkers, make her anxious and that her anxiety is heightened by the presence of lots of people and screaming children. AR 93–94. When her anxiety is heightened, Phillips explained that she will go to the bathroom to calm down, and thought this probably occurred once per week and lasted for about five minutes. AR 94. When asked if she could work eight hours a day, Phillips said that she could not because she would be in too much pain. AR 95. She also testified that she would likely not leave her apartment without her anxiety medications and that she has trouble focusing and concentrating at work if her anxiety is high. AR 97–98. Phillips acknowledged doing chores at home such as vacuuming, sweeping, washing dishes, laundry, making her bed, and cleaning her cat's litter box. AR 100.

The ALJ questioned Phillips about her current work situation, and Phillips testified that she preferred to greet on the general merchandise side of the store because the grocery side was too chaotic. AR 102. She also testified that she had received a rating of "solid performer" on her last evaluation, although her supervisor "got after her" because she does not stand in one spot all the time. AR 102–03. Phillips had mostly superficial contact with people but had a generally good relationship with the regular customers. AR 103. Phillips testified that her hands get tired but noted that she generally does not use them as a greeter except to occasionally help customers who use the electric cart to take items out of it. AR 108–09. Phillips acknowledged being able to handle the machines when she worked in the photo department. AR 109–10.

Warren Haagenson testified as a vocational expert at the hearing. AR 110. The ALJ posed a hypothetical to Haagenson asking if an individual with certain limitations (limited to light work; who could pick up 20 pounds occasionally and 10 pounds or less frequently; sit six hours in an eight hour day; stand and walk combined for six hours in an eight hour day; had no

limits in reaching; could climb stairs, balance, crouch, kneel, stoop and crawl frequently; climb ladders occasionally; had no manipulation or communication limits; and needed to avoid concentrated exposure to hazards) could perform the past work of Phillips, to which Haagenson responded affirmatively. AR 112. Haagenson testified that an individual who was markedly limited by anxiety would not be fit for competitive work, and that an individual with the limitations set forth initially by the ALJ but who was limited to only frequent fingering work would still be able to perform Phillips's past work. AR 113. Phillips's counsel asked Haagenson if a person with the same limitations as set forth by the ALJ but who was further limited to only occasionally handling and fingering work could perform Phillips's past work, to which Haagenson responded no except as to her photofinishing work, and that there was a limited range of other work that such a person could perform, such as counter rental clerk and usher positions. AR 114.

### E. ALJ's Decision

The ALJ issued a decision denying Phillips's application for social security benefits. AR 42–56. In doing so, the ALJ used the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under the "'familiar five-step process' to determine whether an individual is disabled, . . . [t]he ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)) (alteration in original); see also 20 C.F.R. § 416.920(a) (detailing the five-step process used in evaluating claims for SSI).

At the first step, the ALJ determined that Phillips had not engaged in substantial gainful activity since August 1, 2012, the alleged onset date of her disability. AR 44. Although Phillips had continued working at Walmart throughout the period leading up to her hearing, the ALJ determined that part-time work did not rise to the level of substantial gainful activity, though her work activities were relevant to determining her RFC. AR 44.

At step two, the ALJ concluded that Phillips's severe impairments consisted of lower back pain of unclear etiology, noting there was no consensus diagnosis from her treatment providers. AR 44. Although Phillips underwent carpal tunnel surgery in 2000 and complained of wrist and shoulder pain, the ALJ determined that the record evidence did not support a residual issue. AR 44. He noted that Phillips had been cleared to return to work without restriction after modest treatment of both complaints. AR 44–45. The ALJ determined that Phillips's colitis was not a condition that had impaired her for 12 months, noting that her complaints of issues relating to colitis were rare after her alleged onset date and that she had sought minimal treatment after undergoing a colonoscopy in 2013. AR 45.

The ALJ determined that Phillips's depression and anxiety did not result in significant work-related limitations, despite the longstanding diagnoses of these conditions present in the medical records. AR 46. The ALJ stated that Phillips's part-time work at Walmart demonstrated her ability to remember instructions and interact with the public, that the conservative treatment she received did not comport with her subjective claims as to the severity of her condition, and that she had few complaints related to anxiety or depression leading up to her alleged onset date. AR 46. The ALJ discussed Phillips's treatment records with Adams and gave considerable weight to Adams's mental RFC assessment. AR 46–47. However, the ALJ stated that not all of Adams's opinions were accepted in their entirety, and while he did not specify which opinions

were being discounted, this statement immediately followed his discussion of Adams's ratings of moderate limitations regarding Phillips's ability to interact appropriately with the general public being "noteworthy" as her part-time work required her to interact with the public on a regular basis. AR 47. The ALJ discussed Dramstad's mental RFC assessment but gave it limited weight because the extent of the relationship was unclear as the ALJ had no treatment notes and her ratings of marked limitations conflicted both with Adams's opinions and Phillips's ability to maintain part-time employment. AR 47–48. Finally, the ALJ gave considerable weight to the state agency psychological consultants' mental assessments, finding they were consistent with the record as a whole. AR 48.

The ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders. AR 48. The ALJ found Phillips's mental impairments to be non-severe based on the absence of episodes of decomposition of extended duration and only mild limits in activities of daily living, social functioning, and concentration, persistence, and pace. AR 48–49. The ALJ also considered the letters from friends and coworkers submitted by Phillips, but noted that medical provider observations conflicting with the letters' description of the severity of Phillips's conditions deserved greater weight. AR 49.

At step three, the ALJ determined that Phillips did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. AR 50. The ALJ then determined that Phillips had the residual functional capacity to perform light work with certain exertional limitations:

> [S]he can occasionally lift and carry 20 pounds and 10 pounds or less frequently. She sit[sic] 6 hours, as well as stand and walk, 6 hours in an 8-hour workday. She can climb stairs frequently and ladders occasionally. She can balance, crouch, kneel, stoop and crawl frequently. She must avoid concentrated exposure to hazards, such as unprotected heights, fast and dangerous machinery. She has no

reaching, manipulative or communicative limitations, and no visual limitations with proper lenses or glasses.

AR 50. The ALJ discussed Phillips's testimony, but determined her statements regarding the intensity, persistence, and limiting effects of her impairments were not entirely credible based on her activities of daily living, her maintenance of part-time employment, and the lack of support for her claims in the medical evidence. AR 51–52. The ALJ discussed Dr. Lim's physical RFC assessment but gave it limited weight, finding that his opinions were not supported by his treatment notes and that the limits he prescribed were inconsistent with Phillips's activities and work. AR 54–55. The ALJ also discussed the state agency consultants' assessments which found Phillips could perform work at medium exertional levels at the initial level and light exertional levels at the reconsideration level, stating that though they were not accepted in their entirety, they lent further support to the finding that Phillips was not limited to the extent alleged and thus "receive[d] significant weight in such regard." AR 55.

At step five, the ALJ determined Phillips was capable of performing her past relevant work as a retail greeter, photo clerk, cashier, and a small products assembler, which did not require performing work-related activities precluded by her RFC. AR 55.

## III.    Standard of Review

When considering whether the Commissioner properly denied social security benefits, a court must "determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)); see also Nowling v. Colvin, 813 F.3d 1110, 1119–20 (8th Cir. 2016). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," and such errors are reviewed de novo. Collins, 648 F.3d at 871 (internal citations removed). A district

court reviews the Commissioner's decision de novo for any legal errors and to determine if appropriate legal standards were applied. See Collins, 648 F.3d at 871; Robertson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007); Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994); see Nowling, 813 F.3d at 1119; Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also Nowling, 813 F.3d at 1119. It is that which "a reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord Nowling, 813 F.3d at 1119; Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). The "'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

A reviewing court must "consider evidence that supports the [Commissioner's] decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995); see also Nowling, 813 F.3d at 1119. In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the

[Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision' of the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)); see also Chaney, 812 F.3d at 676. The court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." Miller, 784 F.3d at 474 (citing Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014)); see also Nowling, 813 F.3d at 1119.

When Phillips sought review by the Appeals Council, she submitted new evidence. AR 6–7, 362–79, 652–681. The Appeals Council stated that it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council[,]" but that it "found that this information does not provide a basis for changing the [ALJ's] decision." AR 2. The Order of Appeals Council listed and made eight exhibits part of the record: various documents from Walmart, a representative brief, medical records, treatment records from Community Counseling services, and the additional statement from Dr. Lim. AR 6–7. When, as here, the Appeals Council considers new evidence but denies review, a district court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007). In effect, this requires that courts engage in the "peculiar task" of deciding "how the ALJ would have weighed the new evidence had it existed at the initial hearing." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000) (citation omitted). "Critically, however, this court may not reverse the decision of the ALJ merely because substantial evidence may allow for a contrary decision." Id.

## IV.    Discussion

Phillips raises three issues with the ALJ's decision on appeal:

I.    Whether the Commissioner failed to properly identify all of [Phillips's] severe impairments?

II.   Whether the Commissioner erred in evaluating the opinions of [Phillips's] treat[ment] providers?

III.  Whether the Commissioner's determination of [Phillips's] residual functional capacity is supported by substantial evidence?

Doc. 16 at 1. The Court addresses each of these arguments.

### A.  ALJ's Assessment of Severe Impairments at Step Two

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or if a combination of impairments is "severe." 20 C.F.R. §§ 404.1520(c), 416.921. An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. Id. §§ 404.1520(c), 416.921. An impairment or combination of impairments is "not severe" when medical or other evidence establishes only a slight abnormality having no more than a minimal effect on an individual's ability to work. Id. §§ 404.1522(a), 416.921.

The claimant has the burden to establish that her impairment or combination of impairments are severe. Kirby v. Astrue, 500 F. 3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Id. at 708 (internal citation omitted). An impairment is "severe" if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities means "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). These abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple

44

instructions;" "[using] judgment;" "responding appropriately to supervision, coworkers, and usual work situations; and" "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b)(1)–(6). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

The ALJ determined that Phillips had a severe impairment of "low back pain of unclear etiology." AR 44. Phillips takes issue with the ALJ not including manipulative and mental impairments as severe impairments at step two. Doc. 16 at 26–32. Mindful of the "substantial evidence in the record as a whole" standard, this Court cannot conclude that the ALJ erred at step two by failing to include those particular conditions among the severe impairments found. There is substantial evidence in the medical records to conclude that Phillips did not have a severe impairment on account of manipulative or mental limitations.

The medical records reference that Phillips underwent bilateral carpal tunnel surgery around the year 2000 and Phillips testified that her hands were not as strong as they were before that surgery. AR 91–93, 529, 599. The records also contain her treatment history for the August 2012 wrist injury and her September 2012 right shoulder pain. AR 413, 416. Dr. Lim's physical RFC indicated that Phillips was limited in reaching, handling, fingering, and feeling to 33 percent because her hands were weak despite her surgery. AR 591. The letter from Dr. Lim submitted to the Appeals Council clarifies that his ratings of Phillip's limitations were in reference to her limitations which would exist were she working a full-time schedule, i.e., that

45

Phillips's use of her manipulative functions would be limited to no more than 33 percent of a 40-hour work week, and that those limitations would become more severe if she were to attempt to maintain a 40 hour workweek. AR 676–81. Additionally, the state agency consultants rated Phillips as limited in both overhead reaching and fingering at the initial and reconsideration level. AR 125, 150.

Phillips argues that the ALJ erred when he found no medical evidence demonstrating any hand or wrist impairment diminishing Phillips's ability to perform basic work activity. Doc. 16 at 27. However, the ALJ did not deny the existence of *any* evidence of manipulative issues; he determined that the record as a whole did not support a finding that those issues amounted to a severe impairment. AR 44–45. This Court agrees; when Phillips complained of her wrist pain she was at first told not to work for a week, wear a wrist brace, and take Tylenol and Ibuprofen. AR 417. Apparently the order not to work for a week was amended to allow her to return to work on alternative duty without registry work. AR 417. When she returned for treatment the next month, she reported her pain was under much better control and she was cleared to return to work without restriction. AR 416. Phillips's shoulder pain was diagnosed as an overuse injury and she was eventually referred to physical therapy and restricted to lifting no more than 15 pounds and working four hour workdays and four day workweeks. AR 412. Her physical therapist recommended she participate in four weeks of physical therapy, and though it does not appear Phillips attended all of her sessions, her shoulder exam in November of 2012 was unremarkable and she was cleared to return to work without restriction. AR 409–410. Phillips argues the ALJ should have drawn different inferences from the evidence because Phillips's shoulder injury only resolved after physical therapy and because she switched at Walmart from cashier to greeter, but the fact that the ALJ did not draw Phillips's preferred inferences does not

constitute reversible error. See Siemers, 47 F.3d at 301 (noting that if the evidence supports two inconsistent opinions, one of which is the Commissioner's, the court must affirm the Commissioner). The ALJ discussed the evidence relating to Phillips's wrist and shoulder issues, noted the lack of any further evidence documenting problems, and concluded those issues were not severe and would not meet the 12 month durational threshold required under Social Security regulations. AR 45. Substantial evidence in the record as a whole exists to support the ALJ's conclusion that Phillips's manipulative impairments did not constitute a severe impairment. Phillips also takes issue with the ALJ's treatment of Dr. Lim's medical opinion and the assessments of the state agency consultants, but these arguments are more appropriately dealt with in Part B below.

Phillips also argues that the ALJ erred in finding her mental impairments non-severe because such a finding is not supported by substantial evidence. Doc. 16 at 29. The record makes references to Phillips previously seeing Dr. Christopherson for psychiatric medications and at one point Dr. Lim recommends she see Dr. Christopherson for her depression, though no records of treatment from Dr. Christopherson are part of the Administrative Record. AR 487, 567. The ALJ acknowledged the medical records indicated a longstanding diagnosis of depression and anxiety, and discussed Phillips's subjective statements regarding the severity of her conditions as well as the treatment records of Amanda Adams. The ALJ determined that Phillips's own activities of daily living and work activity, coupled with the conservative treatment she had received, indicated her condition was not severe. Additionally, Phillips's

mental impairments were rated non-severe at the initial and reconsideration level by the state agency consultants.[45] AR 122, 147.

The record shows Phillips sought treatment for depression and anxiety primarily from PA Adams who typically prescribed psychiatric medications. Adams also recommended on occasion that Phillips make appointments with Community Counseling Services. AR 404–05. Phillips's medications had to be changed on occasion, and she found some to be effective and others ineffective. AR 400, 401. Phillips reported instances of increased anxiety brought about by isolated events as well, such as her son seeing a counselor and her trepidation about upcoming trips. AR 398, 406. When Phillips was able to stay on her medications, she reported feeling her anxiety and depression were under control, and her PHQ-9 score improved as well. AR 400, 479, 627. Adams also rated Phillips as having only mild or moderate limitations under just some mental functioning categories, although Adams thought her ability to work with others was limited by her social anxiety despite her use of medications. AR 587–89.

The ALJ discounted the mental RFC assessment from Dramstad primarily because there were no accompanying treatment records. Phillips submitted those records to the Appeals Council, and this Court thus engages in the "peculiar task" of deciding how the ALJ would have

---

[45] Phillips argues that the ALJ erred in relying on the state agency psychological consultants' determination of Phillips's mental impairments as non-severe because they were internally inconsistent and, Phillips claims, that the Psychiatric Review Technique (PRT) was not appropriately done at the reconsideration level. Doc. 16 at 31–32. As detailed in section II.C. above, it is true that the assessments listed Phillips's anxiety disorder as severe under the medically determinable impairments diagnosis section. AR 122, 146. However, the narrative explanation in the PRT of both assessments makes clear that based on the evidence of record, the consultants completing the PRT found Phillips's mental impairments to be non-severe. As to Phillips's claim that the second PRT was not done appropriately, this Court disagrees. A review of the relevant medical evidence concerning her depression and anxiety appeared in the "additional explanation" section of the PRT, and the conclusion was that Phillips's mental impairments were non-severe. AR 146. Phillips's assertion to the contrary is not a sufficient basis for this Court to reverse the decision of the Commissioner.

weighed this additional evidence. Bergmann, 207 F.3d at 1068. In this case, Dramstad's treatment notes undermine her mental RFC assessment of marked limitations in Phillips's ability to interact with the general public. As detailed in section II.B.2. above, the records from Phillips's visits to Community Counseling Services demonstrate consistent, sustained improvement. Phillips reported her anxiety to be improving, an ability to resolve a situation with her neighbor and improve her relationship with her mother, attending community events and happiness in doing so, and awareness of her own capacity to change her behavior. AR 654–71. Ultimately, Dramstad discharged Phillips from Community Counseling because Phillips felt she no longer needed therapy, and Dramstad herself recorded that Phillips had significantly improved. AR 672. The treatment notes being inconsistent with Dramstad's rating of marked limitations and Dramstad's ratings being inconsistent with Adams's assessment, the ALJ would likely have even more readily discounted Dramstad's RFC assessment if he had the benefit of viewing the Community Counseling treatment notes.

Phillips argues that the letters from coworkers and friends, the Walmart records showing Phillips's history of absences and early departures after her alleged disability onset date, and the records requesting to reduce her schedule to part-time work are also consistent with a severe mental impairment. Doc 16 at 31. The attendance records do indicate some of Phillips's absences in March and April of 2015 were under FMLA authorization, AR 370–71, and the letters speak to her issues with anxiety. AR 611–18. However, the ALJ also had before him the medical records detailing Phillips's conservative treatment for her anxiety issues, non-severe ratings from the state agency consultants, and Adams' own relatively modest ratings in her mental RFC. The ALJ had conflicting information and could have decided either direction on whether Phillips's mental health issues were a severe impairment. However, substantial

evidence in the record as a whole supports the ALJ's determination that Phillips's depression and anxiety did not constitute severe impairments, so this Court cannot reverse on the issue. See Siemers, 47 F.3d at 301. Moreover, the ALJ did not stop at step two, but determined Phillips to have a different severe impairment and proceeded past step two. The effect of Phillips's manipulative and mental impairments, as it relates to her RFC, is discussed further in Part C below.

### B. Alleged Error in Evaluating Certain Opinions

Phillips argues that the ALJ failed to afford proper and controlling weight to the opinions of Beckett's treating physician, Dr. Lim, and impermissibly discounted the opinions of Adams and Dramstad. The Commissioner is to give controlling weight to the findings of the treating physician on the severity of an impairment, if those findings are well supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Reed v. Barnhart, 399 F.3d 917, 920–21 (8th Cir. 2005). An ALJ must "always give good reasons" for the weight afforded to a treating physician's evaluation. Reed, 399 F.3d at 921 (citing 20 C.F.R. § 404.1527(c)(2)). If controlling weight is not given to the opinions of treating physicians, deference must still be granted, with weighing of the factors set forth in 20 C.F.R. § 404.1527. See Social Security Ruling 96–2p: Giving Controlling Weight to Treating Source Medical Opinions, 61 Fed. Reg. 34,490 (July 2, 1996). However, a treating physician's opinion is not automatically controlling, Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014), and the ALJ is to resolve conflicts among various treating and examining physicians, Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). An ALJ may disregard or discount a treating physician's opinion if medical evidence supports a different conclusion, or if the treating physician renders inconsistent opinions that undermine the

credibility of the opinion. Smith, 756 F.3d at 627. In evaluating a treating physician's opinions, the ALJ is to consider factors such as the examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency with the record as a whole, specialization, and other relevant factors. 20 C.F.R § 416.927(c)(1)–(6).

Phillips argues that the ALJ committed legal error by giving Dr. Lim's statement "very little weight" rather than controlling weight as her treating physician. Doc. 16 at 33. In discussing the physical RFC assessment of Dr. Lim, the ALJ stated:

> As to opinion evidence, Dr. Lim wrote on April 15 that he can't envision her able to complete an eight hour shift at work. At that time, he completed a medical source statement in which he opined as to a number of significant work-related limitations. . . . These opinions do not find support in his progress notes, whether in the form of objective findings or consistent reports of these difficulties by the claimant. Moreover, the very severe limitations expressed in this statement are inconsistent with the claimant's activities of daily living and part-time work. An inability to stand or walk even 2 hours is in direct contrast to the claimant's acknowledgment that she currently stands for 4 hours at work. Thus, while Dr. Lim has a treating relationship with the claimant, the opinions expressed in this form receive only very limited weight.

AR 54–55 (internal quotations and citations omitted). The Commissioner argues that the ALJ properly discounted Dr. Lim's RFC assessment because the limitations he prescribed were inconsistent with his treatment notes, other objective medical evidence, and Phillips's activities of daily living and part-time work. Doc. 18 at 17.

Phillips takes particular issue with the ALJ's reliance on her activities of daily living and part-time work as a basis for discounting Dr. Lim's opinion. Specifically, Phillips argues that Dr. Lim's letter, which Phillips submitted to the Appeals Council, makes clear that the limitations he prescribed in his RFC assessment are those she would experience were she working full-time, hence those limitations are not inconsistent with her activities of daily living.

51

Doc. 16 at 36. Thus, Phillips argues, the ALJ would have given greater weight to Dr. Lim's opinions if he had obtained and reviewed Dr. Lim's letter.

Despite Phillips's arguments to the contrary, substantial evidence exists that justified discounting the opinions of Dr. Lim. Dr. Lim's most aggressive treatment of Phillips appears to be administering a cortisone shot during her April 2014 appointment, where he noted a muscle spasm and some tenderness on palpitation of the lower back. AR 575–76. When Phillips returned in June of 2014 and rated her pain as a 5/10, Dr. Lim increased her Oxycodone quantity to 100 tablets per month and encouraged Phillips to use anti-inflammatory medications. AR 572. In October of 2014, when Phillips rated her pain as a 7/10, Dr. Lim renewed her Oxycodone and told her to return in three months, and recorded no findings of a physical examination of her back. AR 567. When Phillips returned in January of 2015, she reported moderate pain but could not give a number. AR 563. In April 2015, Dr. Lim recorded that Phillips's pain was "the same" but he did not increase her dosage of pain medications while also opining that he could not envision her completing an eight hour workday, and filled out her disability paperwork at that same visit. AR 594. In July of 2015, Dr. Lim noted tenderness of Phillips's back on palpitation but no muscle spasm, and Phillips reported that her pain was averaging 4/10 and that she was gardening about an hour a day before her pain "maxed out." AR 18–19. Dr. Lim did not alter Phillips's medication at that point. Additional records not available to the ALJ show Phillips reported average pain of 4/10 in October 2015 and 3/10 in January of 2016, and Dr. Lim maintained her prescription of Oxycodone at the same levels. AR 16–17. While Phillips complained of increased back pain in April of 2016, she had returned to a level of 3/10 by July 2016, though she noted upper back pain at that time. AR 11–14. Thus, this Court cannot

52

conclude that the ALJ would have given greater weight to Dr. Lim's opinions if the ALJ had the additional materials submitted to the Appeals Council, including Dr. Lim's letter.

In addition to Dr. Lim's treatment notes, other medical evidence undermines his prognosis of severe limitations. Phillips's back X-rays ordered in June of 2012 were unremarkable, and an MRI of Phillips's back ordered by Dr. Huff was normal for Phillips's age. AR 599, 603. Phillips's subjective complaints of pain were made at the same time Dr. Huff noted she was able to rise with minimal difficulty and walk without a limp. AR 600. After Dr. Huff diagnosed Phillips with acute gouty arthropathy and prescribed Allopurinol, Phillips reported her pain had not diminished. AR 596, 606. Dr. Huff noted some limitation to her ability to bend forward and tenderness of the sacroiliac joints, but found a straight leg test to be negative and her hip range of motion normal and without hip pain. AR 607. In December of 2012, over a month after Dr. Huff had administered cortisone shots to Phillips's sacroiliac joints, Phillips reported feeling 75 percent better and Dr. Huff noted she was almost asymptomatic. AR 608. Phillips also was treated by Wonnenberg and Adams on occasion for back pain, and received generally conservative treatment, such as Wonnenberg's recommendation she take Aleve, AR 407, and Adams' recommendation of doing at-home stretching in addition to taking her pain medications. AR 402.

This situation is analogous to Perkins v. Astrue, 648 F.3d 892 (8th Cir. 2011), where the Eighth Circuit affirmed the Commissioner's decision to discount the opinions of a treating physician which were undermined by other evidence in the record. Id. at 899. In affirming the Commissioner's decision to discount the physician's opinions, the Eighth Circuit noted evidence in the record of infrequent complaints of intense pain by the claimant, a lack of tests demonstrating damage to the spine or joint area, a history of conservative treatment, and

evidence regarding the claimant's activities which did not comport with the opinions rendered as to the claimant's limitations. Id. at 898–99. In Phillips's case, the record contains substantial evidence which justifies the ALJ's decision to discount the opinions of Dr. Lim, including a history of conservative treatment, an X-ray and MRI that were deemed normal, and activities of daily living and part-time work that undermine the limitations set forth in Dr. Lim's physical RFC assessment. As in Perkins, this Court cannot determine that the ALJ erred in discounting the opinions of Dr. Lim.

Phillips also argues that the ALJ's view of Dr. Lim's treatment notes not supporting his RFC assessment is analogous to rejecting the state agency consultants' finding that Phillips had severe manipulative limitations, and that this demonstrates the ALJ is impermissibly drawing his own inferences from the medical records. Doc. 16 at 37. As an initial matter, Phillips is mischaracterizing the findings of the state agency consultants by stating they determined she had "severe" manipulative impairments. In the RFC assessments completed at the initial and reconsideration level, the state agency consultants noted Phillips was limited in overhead reaching and fingering at the frequent level based on her history of wrist strain and strain of the shoulders. AR 125, 150. Contrary to Phillips's assertion, the ALJ was not required to adopt the RFC assessment of the state agency consultants if substantial evidence undermined those findings. The ALJ discussed Phillips's manipulative limitations at length at step two of the sequential evaluation process and determined those impairments were not severe, and this Court affirms that decision for the reasons explained in Part IV.A. above.

Phillips next argues that the ALJ impermissibly discounted the opinions in Adams's mental RFC assessment regarding her moderate social interaction limitations by ignoring the evidence of record which supported those limitations and relying on Phillips's part-time work

activity which included interaction with the public. Specifically, Phillips argues that the ALJ ignored Phillips's history of FMLA leave requests which allowed her to maintain employment while taking leave for anxiety and the attendance records which show ongoing absences and early departures, as well as the letters from coworkers and friends describing their observations of Phillips's anxiety. Doc. 16 at 37–38. However, Phillips herself ignores the evidence which undermines Adams's opinions regarding her social interaction limitations. In addition to her work history which the ALJ noted, Phillips testified during her evidentiary hearing that she had a generally good relationship with the regular customers at Walmart. AR 103. The records from Community Counseling Services submitted to the Appeals Council demonstrate that Phillips was able to resolve a conflict with her neighbor, attend community events both alone and with her mother, and received recognition from her employer when a customer wrote to Walmart to detail a pleasant experience when interacting with Phillips. AR 660, 662, 664, 666. Substantial evidence in the record as a whole supports the ALJ's decision to discount Adams's opinions regarding Phillips's social interaction limitations. Smith, 756 F.3d at 627 (noting that an ALJ may disregard or discount an opinion if medical evidence supports a different conclusion or if the provider renders inconsistent opinions that undermine the credibility of the opinions).

Phillips last argues that the ALJ erred in rejecting the opinions of Dramstad and seems to suggest the ALJ failed to develop the record by not obtaining Dramstad's treatment notes, citing Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000). As explained above, Dramstad's treatment notes provide substantial evidence to justify discounting her opinion; thus even if the ALJ should have obtained those records, this would not constitute grounds for reversal because Phillips was not prejudiced by the lack of those records. See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir.

1995) (noting that reversal is only warranted if the failure to develop the record is unfair or prejudicial to the claimant).

### C. Whether the RFC is Supported by Substantial Evidence

Phillips last argues that the ALJ's determination of her residual functional capacity is not supported by substantial evidence because it did not include discussions of her manipulative and mental impairments. Doc. 16 at 39–40. The Commissioner argues first that the ALJ did not err because he did discuss both impairments in detail at step two, and alternatively that if he did err, Phillips cannot show harm. Doc. 18 at 24. The ALJ determined Phillips had a RFC which did not include manipulative or mental limitations. AR 50. While the ALJ could have provided a more thorough explanation in his RFC determination of why Phillips's mental and manipulative impairments did not impact her RFC, substantial evidence in the record as a whole supports his reasoning and conclusion, and thus remanding Phillips's case to the Commissioner to require a more detailed explanation is unwarranted.

A claimant's RFC "is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise, 641 F.3d at 923 (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

When the ALJ determined Phillips's mental impairments were non-severe at step two, he noted that the RFC assessment was distinct from the step two analysis and stated "the following

RFC assessment reflects the degree of limitation the undersigned determined in the 'paragraph B' mental function analysis." AR 49. As detailed in Parts IV.A. and B. of this opinion, substantial evidence exists to justify the ALJ's decision to discount the opinions of Phillips's providers regarding the extent of her impairments and limitations due to mental health issues and to conclude that those impairments are non-severe and in turn do not diminish her RFC.

The ALJ reviewed the medical evidence of record regarding Phillips's manipulative impairments which included her carpal tunnel surgery, her wrist injury from July 2012, and her shoulder pain from late 2012. AR 44–45. At the end of his discussion of the evidence documenting the carpal tunnel surgery and wrist injury, the ALJ stated that "there is no medical evidence demonstrating any hand or wrist impairment diminishing her ability to perform basic work activities or further decreasing her RFC." AR 45. He gave Dr. Lim's opinion regarding Phillips's manipulative limitations very little weight because of a lack of objective medical evidence supporting that conclusion, which this Court affirms for the reasons explained above in Part IV.B. The ALJ reviewed the evidence detailing her shoulder injury and determined it to be non-severe. AR 45. In the portion of the ALJ's decision discussing Phillips's RFC, he briefly discussed the opinions of the state agency consultants, and though he gave them significant weight he noted they were "not accepted in their entirety." AR 55. Both assessments indicated Phillips had manipulative limitations of frequent overhead reaching and fingering which were attributed to her shoulder and wrist strain injuries. AR 125, 150. While it would have been preferable for the ALJ to provide a more thorough explanation at this point, the fact that he had examined the evidence regarding those issues at step two and determined them to be non-severe (and specifically commented at step two that her wrist strain did not impact her RFC) and did not include manipulative limitations in his RFC indicates that he did not accept the state agency

consultants' opinions regarding manipulative limitations. As detailed above, substantial evidence in the record as a whole justifies the ALJ's decision to reject the state agency consultants' opinions regarding Phillips's manipulative limitations.[46]

The ALJ's failure to provide a more detailed explanation of why Phillips's RFC did not include mental or manipulative limitations is disappointing, but on this record does not necessitate or justify a remand of the Commissioner's decision. Congress placed the fact-finding power in the hands of the Commissioner, and instructed reviewing courts that those findings of fact which are supported by substantial evidence "shall be conclusive." 42 U.S.C. § 405(g); see also Benskin, 830 F.3d at 882 ("questions of fact . . . are primarily for the [Commissioner] to decide, not the courts"). There is substantial evidence in the record as a whole to support the

---

[46] The Commissioner argues that this Court should affirm the decision because Phillips cannot show harm stemming from the ALJ's decision not to include mental or manipulative limitations in her RFC because the vocational expert testified that an individual limited to frequent fingering work and who was mildly limited in interacting with the public and moderately limited with coworkers and supervisors could perform Phillips's past relevant work. Doc. 18 at 9–10, 15 (citing Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012)); AR 112–14 (vocational expert's testimony). Phillips takes issue with this argument and asserts that it is unclear that the ALJ relied on the testimony of the vocational expert because it was not discussed in his decision and further asserts that it is inappropriate to speculate how the ALJ may have weighed evidence regarding ongoing FMLA absences and the inconsistencies in the state agency consultants' opinions. Doc. 19 at 2–5. First of all, Phillips is incorrect as to the propriety of speculating how the ALJ would have weighed certain evidence; by submitting additional evidence to the Appeals Council such as the attendance records which indicate ongoing absences, some of which were under FMLA authorization, and then appealing the Commissioner's decision to this Court after the Appeals Council ruled, Phillips gave this Court the "peculiar task" to decide how the ALJ would have viewed that evidence. Bergmann, 207 F.3d at 1068. Second, at step five the ALJ concluded that Phillips could perform her past relevant work, precisely as the vocational expert testified that a person could do with the RFC the ALJ determined Phillips had. AR 55. It is clear enough to this Court that the ALJ relied on the vocational expert's testimony in making his step five determination. Because this Court has found that substantial evidence supports the ALJ's step two determination, RFC determination, and decision to discount certain opinions, it is unnecessary to rely on Byes as a means of affirming the Commissioner's decision. Regardless, an RFC which included mental and manipulative limitations of frequent fingering, mild limitations in interacting with the public, and moderate limitations interacting with supervisors and coworkers would have been supported by substantial evidence in the record as well. See Siemers, 47 F.3d at 301 (noting that if the evidence supports two inconsistent opinions, one of which is the Commissioner's, the court must affirm the Commissioner). The vocational expert's testimony indicated that Phillips could have done her past relevant work and other work notwithstanding such a RFC, so the decision of the Commissioner would be affirmed regardless.

ALJ's determination that Phillips's RFC is not diminished by manipulative or mental impairments, and pursuant to Congress's mandate to uphold such findings of fact, this Court affirms.

V.      **Conclusion**

For the reasons explained above, it is hereby

ORDERED that the decision of the Commissioner is affirmed.  It is further

ORDERED that Phillips's motion for summary judgment, Doc. 15, is denied.


DATED this __6ᵗʰ__ day of February, 2018.

                        BY THE COURT:


                        ROBERTO A. LANGE
                        UNITED STATES DISTRICT JUDGE